[Civ. No. 1843.   Third Appellate District.—May 14, 1918.]

## HOPE MINING COMPANY (a Corporation), Respondent, v. N. H. BURGER, Appellant.

CONSTRUCTIVE TRUST—PURCHASE OF MINING PROPERTY—TAKING OF
DEED IN NAME OF OPTION-HOLDER.—Where a party has an option
to purchase mining property for a certain sum, although it is ap-
parently for a greater sum, and for a valuable consideration such
party transfers the option to a third party and the latter pays
to the owner the full consideration for the property, but the deed
is taken in the name of the original holder of the option, a con-
structive trust is thereby created in favor of the purchaser.

APPEAL from a judgment of the Superior Court of El
Dorado County.   John Hancock, Judge Presiding.

The facts are stated in the opinion of the court.

Butler & Swisler, for Appellant.

L. J. Maddox, for Respondent.

BURNETT, J.—It is difficult to consider seriously the con-
tentions of appellant.   The decision of the trial judge is so
manifestly just and equitable, and the conduct of appellant
in the transaction between the parties so reprehensible, that
probably the only question which we ought to notice specifi-
cally is whether damages should not be imposed for a frivo-
lous appeal.

However, largely out of respect for the learned counsel for
appellant, who has manifested zeal and ability worthy of a bet-
ter cause, we will devote some attention to the essential
features of the case.   There was some conflict in the evidence
upon material points, but the conflict was created by the tes-
timony of appellant and his brother, whose statements on the
witness-stand are apparently characterized by equivocation,
evasion, and misrepresentation.   It is therefore not surprising
that their testimony carried no conviction to the mind of the
trial judge.   From the opinion filed in deciding the case in
the lower court we take the following facts:

The action was brought to compel appellant to convey to
plaintiff certain placer mining claims described in the com-

plaint, paid for with the money of plaintiff, and the title to which was taken in the name of N. H. Burger, who is the real defendant in the case, the other names being fictitious.

In December, 1910, the property was owned by one Thomas Clark, who entered into an oral agreement with defendant for its purchase, which was reduced to writing at Placerville on January 3, 1911. The written instrument was somewhat informal, but it recited the receipt of one hundred dollars from N. H. Burger, "being a partial payment on the bond of property known as the Landecker Mine and equipment on same. The price of said mine and equipment to be eleven thousand dollars to be paid as follows." Then followed the recitation of three installments, the first to be paid January 15 and the last April 1, 1911. It was agreed that a more formal contract should be prepared by Clark and delivered to defendant. This was done on January 14, 1911, and at the trial this agreement was introduced in evidence. According to its terms the purchase price was fixed at fifteen thousand dollars, to be paid in four installments, the last one of four thousand dollars to be made on or before the 1st of November, 1911. At the same time it was orally agreed between Clark and Burger that this sum of four thousand dollars was not to be paid to the former but retained by the latter as a commission, it obviously being the intent that Burger should sell the property to another.

B. E. Burger, brother of defendant, undoubtedly knew of the terms of the agreement between Clark and appellant, and on January 3d he went from Placerville to Modesto and informed the principal stockholders of a mining corporation called the Alliance Company that defendant had an option on the Landecker mine, and wanted the stockholders to form a new corporation and take over the mine and option from his brother. He did this under an understanding with appellant. He had with him a copy of the Clark contract, afterward executed on January 14th, which copy he exhibited to the stockholders. At a meeting held the following night it was agreed that Wooten and Benton, two of the stockholders, with B. E. Burger, would examine the mine, and they proceeded to Placerville for that purpose, where they arrived on January 5th. The next day they and the defendant went out to the mine, and on the following night they met at defendant's store and discussed the advisability of forming a new corporation to take over and operate the mine. Defendant informed Wooten

and Benton that he would turn over the contract if the new company was formed and that he would sell the mine "for just what he had paid for it." After this meeting Wooten and Benton returned to Modesto and reported to the other stockholders of the Alliance Company. About a week later B. E. Burger arrived in Modesto and the plaintiff company was organized. Under said contract of January 14th the first installment of the purchase price could be paid by a joint and several note of defendant and such additional makers as was satisfactory to Clark, said note to be payable on or before February 1, 1911. Two days prior to the execution of said contract of January 14th both defendant and B. E. Burger signed such note at Placerville, and it was by the latter immediately taken to Modesto, where on January 14th it was signed by Benton, Williams, and Wooten, and returned to B. E. Burger and afterward delivered to Clark. As a consideration for the execution of this note twenty-five thousand shares of plaintiff company were divided equally among the five makers of said note and defendant thereby became a stockholder of said company. The Hope Mining Company was organized on January 13, 1911, and its articles filed with the county clerk of Stanislaus County. The company immediately took possession of the mine and it made three payments on the purchase price of said property, amounting to eleven thousand dollars, the last payment being made on April 1st. A large sum was also paid by it for work and supplies, and it repaid defendant the one hundred dollars which he paid Clark on January 3d. Neither the plaintiff nor any of its Modesto stockholders knew that the price of the mine as between Clark and defendant was eleven thousand dollars until the trial of the case at Placerville, when for the first time they learned that the last payment of four thousand dollars as set forth in the contract of January 14th was not to be paid Clark, but was to be treated by defendant as a commission for the sale of the property. The plaintiff believed at all times up to the date of the trial that the purchase price to Clark was fifteen thousand dollars and that the only consideration to be received by defendant was a share of the plaintiff's stock. The deed to the property, dated January 12, 1911, from Clark to defendant was deposited in escrow, under the terms of which defendant could obtain it from the bank when the total sum of eleven thousand dollars was paid. He could therefore have obtained

said deed at any time after April 1st, and he did secure it on August 30th, and had it recorded on that date. On that day he also made a deed of the property to plaintiff, but did not deliver it, and the latter had no knowledge of it until after the commencement of this action. Several weeks before the four thousand dollars were due Clark according to the contract of January 14th plaintiff, through its officers, proposed to levy an assessment to make said payment. But defendant and his brother objected, and to avoid the necessity of levying an assessment it was agreed that the time for the last payment would be extended six months.

On October 30th Campbell and Perkins, two of plaintiff's stockholders, went to Placerville and ascertained that defendant had the deed from Clark, and in explanation of this he told them that he had borrowed the four thousand dollars from a friend named Smith living in San Jose. In March, 1912, and before the expiration of the six months' extension granted by defendant to plaintiff in September, 1911, defendant bonded the property to other parties and the sum of six thousand dollars was received as an installment of the purchase price and divided equally between defendant and his brother.

There is abundant evidence to support the foregoing statements, and it is quite apparent therefrom that defendant acted dishonorably with plaintiff, that by his conduct and actions he led plaintiff to believe that Clark was to receive the full fifteen thousand dollars for the property, whereas defendant had a secret agreement to retain the said four thousand dollars which was to be paid by plaintiff. Appellant was guilty of a species of sharp practice which may be recognized as legitimate by some promoters, but it cannot be tolerated in a court of justice. It is plain enough that by agreement between plaintiff and defendant the former was subrogated to all the rights and privileges as well as the obligations of the latter under his agreement with Clark. Of course, this means the actual and not the ostensible obligations. Plaintiff believed that it was to pay the sum of fifteen thousand dollars, but this was by reason of the deception practiced by appellant, and when it had paid the sum of eleven thousand dollars, the actual burden imposed by the original contract, it had discharged its full obligation and was entitled to the deed from Clark. As plaintiff, therefore, paid the full consideration for the property, manifestly, appellant, in receiving the deed, be-

came a trustee for respondent as the court below rightfully
held. The case is essentially this: B has an option to purchase
the property of C for eleven thousand dollars, although it is
apparently for fifteen thousand dollars. For a valuable con-
sideration B transfers the option to H and the latter pays to C
the full consideration for the property, but the deed is taken
in the name of B. There can be no difference of opinion as to
the constructive trust thereby created. It is true that there
was no formal written assignment of said option, but the
agreement between plaintiff and defendant was such in effect,
and as it was fully executed by plaintiff, there could be no
question of the statute of frauds.

There is some contention made that the agreement con-
tended for by respondent was made by it and said B. E. Bur-
ger and that the evidence is insufficient to show that the latter
was authorized to act for the appellant, and, furthermore, that
the court improperly admitted as evidence of such agency the
declarations of the said B. E. Burger.

There is no merit in the contention. The circumstantial
evidence was amply sufficient to show the authority of B. E.
Burger to represent his brother in the negotiations and con-
tract with plaintiff. Indeed, the conduct of himself and ap-
pellant in the whole transaction is entirely inconsistent with
any other theory than that of agency. It is clear that the acts
of said B. E. Burger were of such character and so construed
as to justify the inference that appellant knew of them and
would not have permitted the same if unauthorized. Hence
the acts themselves were competent evidence of agency. (2
C. J., p. 958.)

Moreover, appellant testified to facts from which the infer-
ence necessarily follows that his brother was authorized to
represent him in the sale. He testified that before his brother
went down to Modesto the latter said: "I can handle the
proposition for you," and appellant gave him a copy of the
contract with Clark, and he knew what his brother went down
there for and the purpose for which he took the note and the
copy of the agreement, and knew what his brother was going to
do. Of course, there could be no possible doubt that there
was, at least, an ostensible agency within the purview of sec-
tions 2300–2317 of the Civil Code. (*Dollar* v. *International
Banking Corp.*, 13 Cal. App. 331, [109 Pac. 499].)

But actual agency was sufficiently established and there was no error in admitting the acts and declarations of B. E. Burger. Where the agency is otherwise *prima facie* proved the declarations of the alleged agent are admissible in corroboration where they constitute a part of the *res gestae* and were made at the time of the transaction in question. They are admissible to show that the agent acted as such and not on his individual account, and also to show the nature and extent of his authority. (*Robinson* v. *American Fish etc. Co.*, 17 Cal. App. 212, [119 Pac. 388]; 2 C. J., p. 930.)

Moreover, the finding of the court below does not depend upon the agreement made between respondent and B. E. Burger. The evidence is sufficient to show that appellant directly agreed with the representatives of plaintiff that the latter should purchase the property for the price that the former agreed to pay Clark; in other words, that there should be a novation, a substitution of plaintiff for defendant in the contract with Clark. The question of agency may therefore be entirely ignored.

Some question is raised as to the sufficiency of the evidence to support certain specific findings. The material findings are amply supported and the others need not be considered.

The judgment could be supported upon another theory, but we forbear to consider it further. The appellant appears in a very unfavorable light, and it is not surprising that the lower court believed that he was much more anxious to keep the property than to tell the truth or to act justly. We may add that, notwithstanding the judgment against him, he seems to have profited greatly by his cleverness. Without paying out anything, he received several thousand shares of stock of the plaintiff, about one thousand dollars in cash from the latter and six thousand dollars from Everett and Ames, to whom he bonded the mine. In good conscience the cash that defendant received should be paid over to plaintiff, but that consideration is not involved in this proceeding.

The judgment is affirmed.

Chipman, P. J., and Hart, J., concurred.